FILED
U.S. DIST COURT
MIDDLE DIST. OF LA

2003 APR 15 P 12: 10

BY DEPUTY CLERK

CV03-289-D-M1

**ROBERT MARTIN on his own behalf
and on behalf of those similarly situated**

SECTION: _____

MAGISTRATE: _____

**VERSUS**

**DEMAND FOR JURY TRIAL**

**LINCOLN ELECTRIC COMPANY; HOBART BROTHERS COMPANY; ILLINOIS
TOOL WORKS, INC.; ESAB GROUP, INC.; SELECT-ARC, INC.; NATIONAL
ELECTRICAL MANUFACTURERS ASSOCIATION; THE FERROALLOYS
ASSOCIATION; AIRCO, INC.; PRAXAIR, INC.; TDY INDUSTRIES, INC.; VIACOM,
INC.; WESTINGHOUSE ELECTRIC CORPORATION; CATERPILLAR, INC.;
GENERAL ELECTRIC COMPANY; UNION CARBIDE CORPORATION; UNION
CARBIDE CHEMICALS AND PLASTICS COMPANY, INC.; EUTECTIC
CORPORATION; A. O. SMITH CORPORATION; SANDVIK, INC.; DELORO
STELLITE COMPANY, INC.; MILLER ELECTRIC MANUFACTURING CO., INC.; J.
W. HARRIS CO., INC.; INDUSTRIAL WELDING SUPPLIES OF HATTIESBURG,
INC.; AIRGAS-GULF STATES, INC.; and JOHN DOE DEFENDANTS A-Z,**

## CLASS ACTION COMPLAINT

NOW INTO COURT, through undersigned counsel, comes plaintiff, Robert Martin, on

his behalf and on behalf of those similarly situated and part of the class of plaintiffs specified

below, all of whom aver as follows:

1.     Made plaintiff herein is the following:

    A.     Robert Martin an adult resident of the Parish of East Baton Rouge; and

    B.     Persons similarly situated but as yet unidentified.

## PURPORTED CLASS

The plaintiff referenced above appears on his own behalf and as a representative of a

class of plaintiffs, such purported class purported class being defined as follows:

All persons and their spouses who reside, resided, work and/or worked in the State of

Louisiana, and are or were exposed to welding fumes containing the air borne

| INITIALS | DOCKET# |
|----------|---------|
| BS | 1 |

BW, Summons issued

metal/chemical/substance manganese, and who sustained direct and/or consequential personal injury, fear fright, or other damage.

2. Made defendants herein are:

A. Lincoln Electric Company ("Lincoln"), a corporation incorporated under the laws of Ohio that is qualified to do business in Louisiana and doing business in Louisiana, with C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

B. Hobart Brothers Company ("Hobart"), a corporation incorporated under the laws of Ohio that is qualified to do business in Louisiana and doing business in Louisiana, with C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

C. Illinois Tool Works, Inc. ("Illinois Tool Works"), a corporation incorporated under the laws of Delaware that is qualified to do business in Louisiana and doing business in Louisiana, with C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

D. The ESAB Group, Inc. ("ESAB"), a corporation incorporated under the laws of Ohio that has done and is doing business in Louisiana but is not qualified to do business in Louisiana, with The Corporation Trust Company, the Corporation Trust Center, 1209 Orange St., Wilington, DE 19801, as its agent for service of process;

E. Select-Arc, Inc. ("Select-ARC"), a corporation incorporated under the laws of Ohio that has done and is doing business in Louisiana but is not

qualified to do business in Louisiana, with Paul E. Zimmer, 2700 Ketting

Tower, 40 N. Main St., Dayton, OH 45423, as its agent for service of

process;

F.    The National Electric Manufacturers Association ("NEMA"), a trade

organization comprised of manufacturers that has a section devoted to the

manufacturer of welding products known as "NEMA Electric Welding

Section" or "NEMA Arc Welding Section";

G.    The Ferrolloys Alloys Association ("TFA"), an association and industry

advocacy group that includes the producers of chromium manganese,

silicone, and vanadium ferroalloys that sponsored a manganese

subcommittee that includes representatives from welding manufacturers,

the AWS, and the NEMA;

H.    Airco, Inc. ("Airco"), now known as The BOC Group, Inc., a corporation

incorporated under the laws of Delaware that is qualified to do business in

Louisiana and doing business in Louisiana with C.T. Corporation System,

8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service

of process;

I.    Praxair, Inc. ("Praxair"), a corporation incorporated under the laws of

Delaware that is qualified to do business in Louisiana and doing business

in Louisiana, with The Prentice-Hall Corporation System, Inc., 701 South

Peters St., Second Floor, New Orleans, LA 70130, as its agent for service

of process;

J.     TDY Industries, Inc., ("Teledyne"), formerly known as Teledyne Industries, Inc., a corporation incorporated under the laws of California that is qualified to do business in Louisiana and doing business in Louisiana, with C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

K.     Viacom, Inc. ("Viacom"), a corporation incorporated under the laws of Delaware that is qualified to do business in Louisiana and doing business in Louisiana with Corporation Service Company, 320 Somerulos St., Baton Rouge, LA 70802-6129, as its agent for service of process;

L.     Westinghouse Electric Corporation ("Westinghouse"), now known as CBS Corporation, a corporation incorporated under the laws of Pennsylvania that is qualified to do business in Louisiana and doing business in Louisiana with C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

M.     Caterpillar, Inc. ("Caterpillar"), a corporation incorporated under the laws of Delaware that is qualified to do business in Louisiana and doing business in Louisiana, with C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

N.     General Electric Company ("General Electric"), a corporation incorporated under the laws of New York that is qualified to do business in Louisiana and doing business in Louisiana, with C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process.

O.      Union Carbide Corporation ("Union Carbide"), a corporation incorporated under the laws of New York that is qualified to do business in Louisiana and doing business in Louisiana, with C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

P.      Union Carbide Chemicals and Plastics Company, Inc. ("Union Carbide Chemicals"), now known as Union Carbide Corporation, a corporation incorporated under the laws of New York that is qualified to do business in Louisiana and doing business in Louisiana, with C.T. Corporation System, 8550 United Plaza Blvd,. Baton Rouge, LA 70809, as its agent for service of process;

Q.      Eutectic Corporation ("Eutectic"), a corporation organized under the laws of New York that has done and is doing business in Louisiana, but is not qualified to do business in Louisiana, with Mitchell Moser, Esquire, 411 East Wisconsin Avenue, Suite 2040, Milwaukee, Wisconsin 53202, as its agent for service of process;

R.      A. O. Smith Corporation ("Smith"), a corporation incorporated under the laws of New York that is qualified to do business in Louisiana and doing business in Louisiana, and its successor in interest St De Bosco, Inc., with Prentice-Hall Corporation System, 1006 Hibernia Bank Building, New Orleans, LA 70112, as its agent for service of process;

S.      Sandvik, Inc. ("Sandvik"), a corporation incorporated under the laws of Delaware that has done and is doing business in Louisiana, but is not

qualified to do business in Louisiana, with C.T. Corporation System, 818 W. 7th St., Los Angeles, CA 90017, as its agent for service of process;

T.     Deloro Stellite Company ("Deloro"), a corporation incorporated under the laws of Delaware that has done and is doing business in Louisiana, but is not qualified to do business in Louisiana, with C.T. Corporation System, 818 W. 7th St., Los Angeles, CA 90017, as its agent for service of process;

U.     Miller Electric Manufacturing Co., Inc. ("Miller Electric"), a corporation incorporated under the laws of Wisconsin that has done and is doing business in Louisiana, with C.T. Corporation System, 44 E. Mifflin St., Madison, WI 53703, as its agent for service of process;

V.     J. W. Harris Co., Inc. ("J. W. Harris"), a corporation incorporated under the laws of Ohio that has done and is doing business in Louisiana with Stephen M. Nechemias, 425 Walnut St., No. 1800, Cincinnati, OH 45202, as its agent for service of process;

W.     Industrial Welding Supplies of Hattiesburg, Inc. ("Industrial Welding"), formerly known as Nordan Smith, a corporation incorporated under the laws of Mississippi doing business in Louisiana whose agent for service of process is C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809;

X.     Airgas-Gulf States, Inc. ("Airgas"), a corporation incorporated under the laws of Delaware that is qualified to do business in Louisiana and doing business in Louisiana, with C.T. Corporation System, 8550 United Plaza Blvd., Baton Rouge, LA 70809, as its agent for service of process;

Y.      John Doe Defendants A-Z, whose identities are unknown to the Plaintiffs at this time, but when those parties' true identities are discovered, the pleadings will be amended by substituting their true names and giving proper notice to these parties, pursuant to L.C.C.P. These Defendants include sellers, suppliers, distributors, and manufacturers that, at any time relevant to these proceedings, supplied welding equipment, supplies, and steel/metal products containing manganese to Avondale Shipyard, Avondale, Louisiana, and also include unknown members of AWS, NEMA and TFA, whose negligence and breaches caused or contributed to cause the Plaintiffs' damages and injuries.

3.      This action is brought pursuant to Louisiana law on behalf of the above named persons, and on behalf of those similarly situated whom pursuant to laws applicable to such persons, all of whom sustained direct and/or consequential effects, injury and damage as a result of the exposure to welding fumes containing the air borne metal/chemical/substance manganese.

## FACTS

4.      Over the years, Plaintiff Robert Martin and persons who are similarly situated but as yet unidentified, were at various times exposed to toxic fumes resulting from welding while working at their livelihood.

5.      The ordinary and intended use of welding products caused emission of fumes that contain manganese ("welding fumes").

6.      Since 1837, manganese has been medically recognized as toxic to the human central nervous system in levels that exceed the trace amounts normally found in

the human body. Toxicity of manganese causes progressive, disabling neurological damage known as manganese poisoning, and consequently, Plaintiff is entitled to medical monitoring at the expense of Defendants. People who suffer manganese poisoning suffer from debilitating neurological problems that effect their ability to think, talk, eat, move, sleep and work.

7.    Persons exposed to welding fumes absorb them into their body primarily through inhalation. Manganese exposure for a period as short as 49 days causes manganese poisoning and progressive, disabling, neurological damage.

8.    While working, Plaintiff Robert Martin and persons who were similarly situated but as yet unidentified were exposed to welding fumes while using welding products and equipment or working in the proximity of other persons using welding products or equipment.

9.    As a direct and proximate result of exposure to welding fumes, Plaintiff Robert Martin and persons who were similarly situated but as yet unidentified have developed ongoing and related symptoms indicative of the condition known as manganism, or manganese poisoning.

10.   As a direct and proximate result of exposure to welding fumes, Plaintiff Robert Martin and persons who were similarly situated but as yet unidentified have suffered permanent neurological and physical damage, severe physical and mental pain, loss of wages, loss of earning capacity, disability, medical expenses, and loss of enjoyment of life in varying degrees.

11.   At all relevant times, Plaintiff Robert Martin and persons who were similarly situated but as yet unidentified, (hereinafter "Plaintiffs") were ignorant of the

dangerous nature of welding fumes, manganese, and the neurological injuries that could occur because of exposure to welding fumes.

12. Any reasonable persons, including Plaintiffs, if adequately informed of the hazards of exposure to welding fumes, would not have willingly exposed themselves to welding fumes in workplaces without necessary precautionary measures.

13. All of the Defendants are or were manufacturers, sellers, suppliers or large industrial consumers of welding products.

14. Through industry and medical studies, unknown to Plaintiffs, the Defendants knew or should have known of the health hazards inherent in the products they were selling, distributing, or using. The Defendants ignored or deliberately and fraudulently concealed that information, or condoned the concealment, and/or conspired with, advised, encouraged, or aided others and/or each other to do so, in order to sell their products and/or avoid the costs of safety precautions, and/or avoid litigation by people injured by welding fumes. These actions or inactions demonstrate a reckless disregard for the rights and safety of others.

15. The Defendants committed numerous tortious acts that included fraudulently and negligently misrepresenting, concealing, suppressing, and omitting material information about the health effects of welding fumes and precautionary measures as specifically alleged below.

16. NEMA is a trade organization comprised of manufacturers that has a section devoted to the manufacturers of welding products known as "NEMA Electric Welding Section" or "NEMA Arc Welding Section" ("NEMA Welding Section").

17. TFA is an industry advocacy group consisting of producers of chromium, manganese, silicon, and vanadium ferroalloys that sponsored a manganese subcommittee that includes representatives from welding manufacturers and the AWS and NEMA. The TFA's membership included management representatives of companies that produce welding products and large consumers that purchase the products for use in their operations.

18. The Defendants created committees within these trade organizations and then used the committees to fraudulently and negligently misrepresent, conceal, suppress, and omit material information about the health effects of welding fumes and necessary precautionary measures.

19. Specific examples of the trade association committees controlled by Denfendants and their activities are identified below.

20. The Defendants controlled and used the committees to conceal the dangers from people exposed to welding fumes by:

   A. Limiting individual membership on relevant committees exclusively or primarily to employees of the Defendants or their designated representatives;

   B. Maintaining, through Defendants' delegates, majority or exclusive voting control of the committees at all times;

   C. Selecting the assignments or proposals considered by each committee;

   D. Funding projects chosen by Defendants;

   E. Using the Defendants' delegates to prepare the written records of the business transacted by each committee; and/or

   F. Reviewing and editing, to the satisfaction of the Defendants, studies performed by consultants hired by the committees.

21.    From at least 1937 to the present, the Defendants, by their actions and through trade association committees they controlled, undertook studies, issued product labels and other health and safety information, and issued specifications and standards for ventilation, safety equipment, and other precautionary measures.

22.    At all times, the Defendants acted with the intent to conceal the health hazards of welding fumes, and specifically manganese, knowing that their studies, publications, specifications, and standards would be adopted and relied upon by manufacturers, sellers, and large consumers of welding products as the authoritative source for warnings, instructions, and precautionary measures printed on product labels and otherwise distributed in the stream of commerce.

23.    The Defendants had actual knowledge about the casual relationship between manganese-containing welding fumes and neurological injury. The Defendants concealed this information from workers exposed to welding fumes.

24.    The casual connection between neurological injuries and welding fumes containing manganese has been scientifically documented since 1932.

25.    In 1932, a medical article was published documenting two cases of welders with neurological injury caused by manganese poisoning from welding fumes. The copy of this article or a summary of the medical article was received in the libraries of many or all Defendants.

26.    The 1937, NEMA's Welding Section received further notice of the contents of the 1932 medical article through a welding safety booklet published by an insurance company stating that manganese in welding fumes "causes a disease similar to *paralysis agitans* [Parkinson's disease]".

27. In 1944, NEMA's Welding Section received notice of a claim of manganese poisoning in a welder.

28. In 1958, the AWS-sponsored Z49 Committee issued a technical document, (not intended for use by welders) approved by the AWS Technical Committee, an oversight committee for AWS activities, reflecting its knowledge that manganese in welding fumes is a potentially toxic substance.

29. In 1966, at a meeting of a task group of the AWS Filler Metal Committee, members of the committee reviewed an industrial hygiene article identifying manganese as a toxic substance in welding fumes, and the Committee discussed neurological injuries in welders.

30. In 1970, the AWS Task Group on Welding Fumes received notice, through a literature search submitted by a consultant hired by the Task Group on Welding Fumes, that welding fumes could cause neurological damage due to manganese poisoning, and that the symptoms of manganese poisoning resemble the symptoms of Parkinson's Disease.

31. In 1970, the AWS Task Group on Welding Fumes received notice, through a welding fume study conducted by a consultant hired by the Task Group on Welding Fumes, that welding fumes could easily exceed the recommended occupational exposure guidelines, even when ventilation standards specified by Defendants were followed.

32. Beginning in the late 1970's the AWS Safety and Health Committee received notice of claims of welders suffering neurological injuries from manganese in welding fumes.

33.    In 1978, the AWS Safety and Health Committee received notice, through a

literature search report submitted by a consultant hired by the Committee, that

welders can suffer neurological damage from manganese in welding fumes. A

portion of this report is quoted below:

> "Although a number of cases... have been reported, there are no recent
> studies reported in the literature which explore the magnitude of the
> problem of chronic manganese poisoning in welders. In future
> epidemiological studies of various welding populations, the prevalence of
> this disease should be investigated.
> ...
>
> Early symptoms of chronic manganism include restlessness, irritability
> and a tendency to laugh or cry without purpose. These symptoms may be
> followed by apathy, visual hallucinations, uncontrollable impulse, flight of
> ideas, mental confusion or euphoria.
>
> Mask-like facial expression, spastic grin, muscle rigidity, slow gait with
> sliding of the feet, increased and abnormal reflexes, monotonous blurred
> speech with poor articulation, tremors, irregular handwriting, impaired
> hearing, double vision, abnormal reactions to pain, touch, heat and
> pressure, excessive salivation and perspiration, sexual impotence and
> diminution of libido have been described by various authors.... Mental
> activity is reported to be slowed, judgment impaired and memory
> weakened, but intelligence remains normal.
> ...
>
> The observation that manganism resembles Parkinson's Disease deserves
> emphasis. Although no data on the prevalence of Parkinsonism in welders
> are available, there is a concern that some cases of manganese poisoning
> could be mistakenly diagnosed as Parkinson's Disease. Further
> investigations may be warranted.
>
> Manganism, like Parkinsonism, responds favorably to treatment with the
> drug levodopa (L-dopa), indicating that the two diseases may share certain
> biological abnormalities: depletion of dopamine (a neurotransmitter in the
> basal ganglia of the brain) and depletion of melanin pigment content of the
> nerve cells of the substantia nigra, also in the brain."

34.    In 1978, the same consultant described above in paragraph 35 reported to the

AWS Safety and Health Committee that manganese poisoning from welding

fumes could be misdiagnosed as idiopathic Parkinson's Disease, and that the problem was so widespread that it required an epidemiological study.

35. In 1979, the AWS Research Committee and the AWS Executive Committee on Safety and Health concluded that there was sufficient evidence to justify the funding of an epidemiological study that would include the study of neurological problems in welders. The committee voted to undertake this epidemiological study, although it was never completed.

36. The 1983, the AWS Safety and Health Committee received notice through an independent literature search that maganese poisoning is "readily confused with Parkinson's Disease," and also that in a study in India, 40% of the welders studied suffered "neurological injury".

37. Beginning in the late 1970s and early 1980s the Defendants through the AWS Safety and Health Committee and NEMA Welding Section sponsored "Industry Defense Committee", receiving notice of claims of manganese poisoning filed as lawsuits against companies in the welding industry.

38. In 1984, the chairperson of the AWS Safety and Health Committee admitted that "manganese fumes can cause a disease quite similar to Parkinson's Disease after six months to two years of exposure". The Defendants were aware of this admission.

39. Beginning in 1985 and continuing to the present, certain Defendants admitted in their Material Safety Data Sheets ("MSDS"), that are technical documents of limited distribution, their knowledge that manganese in welding fumes could cause neurological damage.

40.     Because not all Defendants attended each meeting, it was a regular practice of the

        trade association committees to publish written minutes that were disseminated to

        all committee members including those not in attendance, for the purpose of

        ratifying and adopting the actions taken and decisions made at the meetings.

41.     At a meeting of NEMA's Welding Section held on March 16, 1937, the

        Defendants in attendance agreed to and did intentionally, knowingly, and

        recklessly conceal known hazards associated with welding fumes by forming a

        "Dust and Smoke Committee" to preempt investigation of welding fume hazards

        by independent sources that were not controlled by Defendants.

42.     During meetings of NEMA's Welding Section held between January 20 and June

        23, 1938, the Defendants in attendance agreed to and did intentionally,

        knowingly, and recklessly conceal known hazards of welding fumes by changing

        the language of a publication issued by an insurance company to delete the

        original statement in the publication that manganese in welding fumes causes a

        disabling illness similar to Parkinson's Disease.

43.     In 1939-40, at meetings of NEMA's Welding Section, the Defendants in

        attendance agreed to and did intentionally, knowingly, and recklessly conceal the

        hazards of welding fumes by purporting to undertake an investigation of the

        health hazards of welding fumes and then, upon its completion, changing the

        conclusions of the study, so as to falsely represent that welding fumes were not

        harmful to welders.

44.     In 1949, as part of a scheme to create and disseminate false evidence useful in

        defending against claims brought by persons injured by exposure to welding

fumes, Defendant members of NEMA's Arc Welding Section agreed to and did intentionally, knowingly, and recklessly conceal known hazards of welding fumes by providing information for and causing publication in a welding trade journal of a two-part article that made the misrepresentation that welding fumes were not toxic.

45.     In 1949 and 1951, at meetings of NEMA's Arc Welding Section which considered precautionary measures, the Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by rejecting the adoption of any precautionary product labels for welding products because the Defendants feared that welders would be afraid to use welding products if they saw precautionary product labels, and therefore sales of welding products would be reduced.

46.     In 1952, the Defendants reorganized the AWS Safety Recommendations Committee and called a meeting to consider the furnishing of safety and health information at which they agreed to, and did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by rejecting the adoption of any precautionary product labels for welding products.

47.     In 1952, at a meeting of the AWS Safety Recommendations Committee, the Defendants in attendance agreed to, and did intentionally, knowingly, and recklessly adopt a policy of refuting existing reports of welding fumes hazards by publishing their own reports that misrepresented exposure to welding fumes as safe.

48.     In 1957, the Defendants agreed to, and did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by sponsoring the publication of an article in the *Welding Engineer* trade publication that made the misrepresentation that "toxic gases are not produced by electrode coatings".

49.     In 1966, at meetings of the AWS A5 Filler Metal Committee and a task group, the Defendants in attendance intentionally, knowingly, and recklessly agreed to publication in a trade journal of an article misrepresenting the health hazards of welding fumes as causing only "temporary disability".

50.     In 1966, at meetings of the A5 Filler Metal Committee of the AWS and a Task Group of that committee, the Defendants in attendance agreed to, and did intentionally, knowingly, and recklessly conceal health hazards of welding fumes by establishing industry-wide specifications for precautionary product labels that failed to warn workers of the danger of manganese in welding fumes. This precautionary label stated:

> Welding may produce fumes and gases hazardous to health. Avoid breathing these fumes and gases. Use adequate ventilation. See USAS Z49.1 "Safety in Welding & Cutting," published by the American Welding Society.

51.     In 1966, at meetings of the A5 Filler Metal Committee of the AWS and a Task Group of that committee, the Defendants in attendance established industry-wide specifications for precautionary product labels which did intentionally, knowingly, and recklessly omit instructions about necessary ventilation, precautionary measures, and other information, needed to protect workers against the toxic effect of manganese.

52. In 1966-67, through votes on a ballot distributed to the Defendants through the A5 Filler Metal Committee of the AWS, the Defendants did intentionally, knowingly, and recklessly approve, as part of the AWS required specifications for most welding products, a precautionary product label concealing health hazards from welding fumes and omitting instructions about necessary ventilation, precautionary measures, and other information.

53. From 1975-79, the Defendants, through the AWS Committee on Safety and Health, did intentionally, knowingly, and recklessly conceal the known hazards of welding fumes by providing information that misrepresented the hazards associated with welding fumes as part of a deliberate scheme to prevent an independent standard-setting organization from lowering the occupational exposure guidelines for iron oxide and general welding fumes.

54. In 1979, at meetings of a joint AWS-NEMA committee consisting of a special Task Group of the A5 Filler Metal Committee of the AWS and the Labeling and Safe Practices Committee of NEMA's Arc Welding Section, Defendants intentionally, knowingly, and recklessly established industry-wide specifications for precautionary product labels that concealed the health hazards of welding fumes by omitting any reference to the toxic effects of manganese in welding fumes.

55. In 1979, at meetings of a joint AWS-NEMA committee consisting of a special Task Group of the A5 Filler Metal Committee of the AWS and the Labeling and Safe Practices Committee of NEMA, the Defendants did intentionally, knowingly, and recklessly establish industry specifications for precautionary measures and

other information needed by workers to protect against the toxic effects of manganese in welding fumes.

56.     In 1979, through votes on a ballot distributed to the Defendants through the AWS-NEMA Joint Committee on Precautionary Labels and the A5 Filler Metal Committee of the AWS-NEMA, the Defendants did intentionally, knowingly, and recklessly approve as part of the required industry-wide specifications for most welding products a precautionary product label concealing health hazards and omitting instructions about necessary ventilation, precautionary measures, and other information. This precautionary label stated in pertinent part:

> **"WARNING:** Protect yourself and others. Read and understand this label.
>
> **FUMES AND GASES** can be dangerous to your health.
>
> Read and understand the manufacturer's instructions and your employer's safety practices.
>
> Keep your head out of the fumes.
>
> Use enough ventilation, exhaust at the arc, or both, to keep the fumes and gases from your breathing zone, and the general area.
>
> See American National Standard Z49.1 "Safety in Welding and Cutting" published by the American Welding Society.

57.     Beginning in 1979 and continuing until the present time, at meetings of the AWS Technical Council and Board of Directors, the Defendants in attendance did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by failing and refusing to perform an epidemiological study, recommended by other AWS committees and an independent consultant retained by the

Defendants, to investigate the neurological effects of welding fumes on persons exposed to welding fumes.

58.	In 1980, at meetings of NEMA's Ad Hoc Committee on Precautionary Labeling, the Defendants in attendance did intentionally, knowingly, and recklessly conceal health hazards of welding fumes by approving industry specifications for precautionary product labels for welding power sources that omitted reference to the toxic effects of manganese in welding fumes on persons exposed to welding fumes.

59.	Beginning in 1980, at meetings of the NEMA Ad Hoc Committee on Precautionary Labeling, the Defendants in attendance did intentionally, knowingly, and recklessly approve industry specifications for precautionary product labels for welding power sources that omitted necessary instructions about ventilation, precautionary measures, and other information needed to protect against the toxic effects of manganese in welding fumes.

60.	Beginning in 1980 and continuing until 1966, at meetings of the NEMA MSDS Task Force Committee and the AWS SH-4 Ad Hoc Committee on Suggestions and Changes to NEMA Publication EW 5-1982, the Defendants in attendance did intentionally, knowingly, and recklessly agree to conceal health hazards of welding fumes by adopting a recommended format for the Hazardous Material and Health Hazard Data sections of the Material Safety Data Sheets (MSDS) for welding products that omitted reference to the manganese content of welding fumes, the neurological damage caused by manganese in welding fumes, and necessary instructions for protection against the health hazards of welding fumes.

61. Beginning in 1993 and continuing to the present time, the Defendants, through the AWS Safety and Health Committee and NEMA Welding Section, did intentionally, knowingly, and recklessly seek to conceal the health hazards of manganese in welding fumes by appointing designated representatives to become committee members of, and providing funding for, a trade organization called the Ferroalloys Association ("TFA"), which opposes restrictions on the guidelines for manganese exposure levels established by various authorities.

62. In 1993-95, the Defendants, through the above described organization sponsored by the AWS Safety and Health Committee and NEMA Welding Section, as part of a scheme to prevent the lowering of occupational exposure guidelines for manganese in welding fumes established by the American Conference of Governmental Industrial Hygienists ("ACGIH"), did intentionally, knowingly, and recklessly seek to conceal the health hazards of manganese in welding fumes by providing false and misleading information that exposure to manganese in welding fumes did not cause neurological injury.

## FIRST CLAIM – CONSPIRACY AND FRAUDULENT CONCEALMENT

63. The Plaintiffs reallege and incorporate the foregoing allegations.

64. At all relevant times, the Defendants, with knowledge of the health hazards of manganese in welding fumes acted in concert and conspired in pursuance of a common plan or design to commit the following tortious acts:

    A.    Fraudulently conceal, misrepresent, and suppress material scientific and medical information about the toxic effects of manganese in welding fumes;

B. Deliberately fail to warn persons in proximity of welding fumes of the known health hazards of manganese in welding fumes;

C. Deliberately breach their duty to instruct about proper ventilation, safety equipment, or other precautionary measures which would protect against the health hazards of manganese in the welding process;

D. Deliberately breach their duty to investigate the health hazards of manganese welding;

E. Sell welding products in a defective condition without necessary warnings of the catastrophic health hazards or instructions concerning precautionary measures; and/or

F. Such other acts of negligence and omissions as will be shown at the trial of this matter. All of which acts are in violation of the laws of Louisiana.

65. The Defendants knowingly agreed to participate in the conspiracy by one or more of the following means:

A. Actively taking part;

B. Furthering it by cooperation; and/or

C. Ratifying and adopting acts of other conspirators done for their benefit.

66. The Defendants participated in furthering the unlawful purposes of the conspiracy by delegating responsibilities to and carrying these out through the trade association committees.

67. In furtherance of the conspiracy, the Defendants then committed overt and tortious acts.

68. Upon information and belief, the Defendants committed numerous other overt and tortious acts, that are unknown to Plaintiffs at this time, in furtherance of the conspiracy through letters, memoranda, publications, meetings, telephone

conversations, and other forms of communication directly between the Defendants and through the trade organization committees.

69.     As a direct and proximate result of the Defendants' acts of conspiracy, Plaintiffs and those similarly situated but as yet unidentified were exposed to toxic welding fumes resulting in neurological injuries, necessitating the medical monitoring of plaintiffs and plaintiffs' spouses suffered damages for loss of consortium.

## SECOND CLAIM – NEGLIGENCE

70.     The Plaintiff and those he represents reallege and incorporate the foregoing allegations.

71.     At all relevant times, it was reasonably foreseeable by the Defendants that welders and persons in proximity to welding fumes, including Plaintiff Robert Martin and those similarly situated whom he represents, would be exposed to welding fumes containing manganese by using welding products or working in proximity of other workers using welding products.

72.     The Defendants assumed a duty to exercise reasonable care for the safety of the Plaintiffs and those they represent.

73.     Because exposure to welding fumes presents a risk of physical harm, all Defendants had a legal duty to exercise reasonable care for the safety of the Plaintiffs and those similarly situated that they represent when making representations about welding safety and health in warning labels, publications, and instructions for ventilation and other precautionary measures.

74.     The Defendants knew, or in the exercise of ordinary care should have known, that persons exposed to welding fumes would act in reliance upon representations

made by the Defendants about the health hazards associated with welding fumes and the precautionary measures required to protect against those health hazards.

75. The Defendants knew, or in the exercise of ordinary care should have known, that welding fumes would cause neurological damage to workers like Plaintiff Robert Martin and those similarly situated but as yet unidentified.

76. The Defendants breached their duty of reasonable care and were negligent, without regard to whether the acts were intentional, knowing, or reckless.

77. Beginning in 1970, the Defendants violated OSHA standards about publication of information about health hazards through MSDS guidelines that omitted necessary instructions about target organs, ventilation, precautionary measures, and other information needed to protect against the toxic effects of manganese in welding fumes.

78. The Defendants violated industry standards about health and safety as set forth in the Z49 documents adopted by the AWS sponsored Z49.1 committee beginning in 1950 by failing to publish adequate warning of precautionary instructions and other information to welders or persons in the proximity of welding fumes about the standard.

79. As a direct and proximate result of the Defendants' negligent acts and omissions, Plaintiffs suffered, and continues to suffer, severe neurological injuries which will require medical monitoring of the Plaintiff, and Plaintiff's spouse suffered damages for loss of consortium.

## THIRD CLAIM – NEGLIGENT SALE OF PRODUCT

80. The Plaintiffs reallege and incorporate the foregoing allegations.

81.    Lincoln, ESAB, Select-ARC, Hobart, Illinois Tool Works, Airco, Praxair, Teledyne, Deloro Stellite, Sandvik, Westinghouse, Eutectic, Miller Electric, J. W. Harris, Industrial Welding, and Airgas (collectively, the "seller Defendants"), during some or all relevant times, manufactured, sold, or distributed welding products that were supplied to Plaintiffs' work sites.

82.    Plaintiffs were exposed to welding fumes containing manganese from products sold by the seller Defendants, while plaintiffs were using these products and/or working in the proximity of other using these products.

83.    The seller Defendants had the duty, as product sellers, to exercise reasonable care for the safety of the Plaintiffs.

84.    These duties included the responsibility for the following safety and health matters relating to welding fumes:

    A.    The investigation of the health hazards;

    B.    Writing and publishing adequate and timely precautionary product labels and other health and safety information;

    C.    Writing and publishing adequate and timely specifications and standards about ventilation, safety equipment, and other precautionary measures; and/or

    D.    Such other acts of negligence and omissions as will be shown at the trial of this matter. All of which acts are in violation of the laws of Louisiana.

85.    The Defendants knew, or in the exercise of reasonable care should have known, that welding fumes would cause neurological damage to welders and employees working in the proximity of other using the products such as Plaintiffs herein.

86.     The Defendants breached their duty of reasonable care to the Plaintiffs and were

        negligent, without regard to whether the acts were intentional, knowing or

        reckless.

87.     Beginning in 1970, the Defendants violated OSHA standards about publication of

        information about health hazards through MSDS guidelines that omitted

        necessary instructions about target organs, ventilation, precautionary measures,

        and other information needed to protect against the toxic effects of manganese in

        welding fumes.

88.     The Defendants violated industry standards about health and safety as set forth in

        the Z49 documents adopted by the AWS-sponsored Z49.1 committee beginning in

        1950 by failing to publish adequate and timely warning of precautionary

        instructions and other information to welders or persons in the proximity to

        welding fume about the standard.

89.     As a direct and proximate result of the Defendants' negligent acts and omissions,

        Plaintiffs have suffered, and continues to suffer, severe neurological injuries

        which require the medical monitoring of Plaintiffs, and Plaintiffs' spouses

        suffered damages for loss of consortium.

## FOURTH CLAIM – STRICT LIABILITY

## SALE OF UNREASONABLY DANGEROUS PRODUCT

90.     The Plaintiffs reallege and incorporate the foregoing allegations.

91.     The seller Defendants identified above in paragraph 81 manufacture, sell, or

        distribute welding products that produce, or cause the production of, manganese-

        containing welding fumes, that the products were expected to and did reach

various locations in Louisiana and elsewhere without substantial change in the condition in which they were sold.

92.    Plaintiffs were exposed to welding fumes containing manganese from products sold by the seller Defendants, while using the products or working in the proximity of other using the products.

93.    The seller Defendants' products are unreasonably dangerous because, when used for their reasonably foreseeable and intended purposes in the welding process, they produce harmful fumes that cause neurological injuries.

94.    The seller Defendants' products are defective because:

A.     Adequate and timely warnings were not provided to users that the products produce harmful fumes;

B.     Adequate and timely instructions were not provided to users about ventilation, safety equipment, or other precautionary measures;

C.     The Defendants failed to test or investigate the health hazards associated with the products;

D.     The design of the product does not protect the user from exposure to the harmful fumes; and/or

E.     Such other acts of negligence and omissions as will be shown at the trial of this matter. All of which acts are in violation of the laws of Louisiana.

95.    The defects in the seller Defendants' products existed when the products left the Defendants' control.

96.    The defects in the seller Defendants' products were the proximate cause of the Plaintiff's injuries and damages.

97.    At all relevant times, the Plaintiffs had no knowledge of the defects in the seller Defendants' products.

## DAMAGES

98.    As a proximate result of all the Defendants' breaches of their duties to the
       Plaintiffs, Plaintiffs have sustained, and will sustain, welding fume-related
       injuries, conditions, and damages, including past and future pain and suffering;
       past and future medical treatment and medical expenses; past and future
       rehabilitation, life care expenses, and medical monitoring; past lost wages and
       future disability; past and future impairment of earning capacity; a diminution in
       his quality and enjoyment of life; and emotional distress.

98.    Complainants and those similarly situated live in an ever-present fear that as a
       result of the exposure they will suffer adverse health consequences and/or
       disabling or terminal diseases in the future.

99.    All of the above consideration caused considerable fear, anguish, discomfort and
       inconvenience of complainants and those similarly situated, as well as injuries
       which required or require medical treatment and physical, mental and emotional
       damage.  Consequently, Plaintiffs are entitled to medical monitoring at the
       expense of the defendants.

100.   The medical monitoring to which Plaintiffs are entitled include, but are not
       limited to, preventative screening, neurological and other testing, neurologists and
       other physicians evaluations, examinations and care and treatment of the resultant
       medical conditions.

101.   Plaintiff's spouse has suffered, and will continue to suffer loss of consortium for
       the substantial interference in their relationship with the injured spouses,

including loss of the aid, comfort, companionship, society, and services of the injured spouse.

102.  The claim of some of the plaintiffs herein equals $75,000.00 (Seventy Five Thousand and No/100 Dollars) and the claim of some of the plaintiffs herein exceeds $75,000.00 (Seventy Five Thousand and No/100 Dollars).

103.  Plaintiffs herein rely solely and exclusively on state laws, and neither rely on nor invoke federal causes of action, federal law or regulation, federal questions in seeking their remedies.

## CLASS ACTION

14.  This action is appropriate for determination through the Louisiana Class Action Procedure for the following reasons:

1.  The large number of potential claimants present a level of numerosity better handled through the class action procedure as opposed to a mass joinder of individual claims;

2.  The common issues of law and fact pertaining to the determination of fault and the liability for compensatory and exemplary damages predominate over the individual issue of quantum;

3.  The determination of fault and the basis for assessment of compensatory and exemplary damage may be made in the class action without the necessity of proof at that time as to the amount of those damages, thereby establishing guidelines for settlement and/or subsequent trials in individual cases if necessary;

4.  Petitioners herein have sustained damages of the nature described hereinabove and are suitable representatives of class;

5.  The Plaintiffs herein are represented by skilled attorneys who are experienced in handling mass torts and class actions, and who can be expected to handle this matter in an expeditious and economical matter to the best interests of the class membership;

6.  The class action procedure is the superior vehicle for the efficient disposition of the issues and claims herein presented.

**WHEREFORE,** Plaintiffs pray:

1.  That Defendants be duly served with a copy of this Petition and be required to answer same, all in accordance with law;

2.  That after due proceedings had, that this action be certified as a class action, as alleged above, for the purposes of determining the common issue of liability for appropriate damages;

3.  That upon certification of the class action, the Court call for the formulation of a suitable management plan;

4.  That after due proceedings had, and a trial by jury, there be judgment herein in favor of Plaintiffs and against Defendants, for all damages which are reasonable in the premises, together with legal interest thereon from the date of judicial demand until paid, and for all costs of these proceedings;

5.  That Plaintiffs recover their costs for the prosecution of this class action.

RESPECTFULLY SUBMITTED:

REBECCA A. CUNARD
LA. BAR ROLL NO.: 20154
9214 INTERLINE AVENUE
BATON ROUGE, LOUISIANA 70809
(225) 925-2978